UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

UNITED STATES OF AMERICA

     - v. -

                                      10 Cr. 391(CM)

ANTHONY BOYKIN et al.,

               Defendants.

-------------------------------------------------------------X

MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT JOSHUA ARNOLD AND CODEFENDANTS'
MOTION THAT THE FAIR SENTENCING ACT OF 2010
SHOULD HAVE RETROSPECTIVE EFFECT

SAM A. SCHMIDT, ESQ.
Counsel for Defendant
Joshua Arnold
111 Broadway, Suite 1305
New York, New York 10006
(212) 346-4666

# TABLE OF CONTENTS

The Fair Sentencing Act's Modification of the Threshold
Quantities of Crack Cocaine, Rather than the Racially Disparate
and Harsh Provisions of the Anti-drug Abuse Act of 1986
Apply to this Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

The Act Did Not Fundamentally Change the Penalty Structure
of the Existing Statute. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
The Act Primarily Made a Remedial or Procedural Change in
the Law Rather than a Substantive Change. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

The Legislative History of the Act Shows That Congress Wanted
to End Immediately the Discriminatory Injustice Wrought by the
1986 Law's 100:1 Crack–to-powder Ratio. . . . . . . . . . . . . . . . . . . . . . . . . . . . .. 9

Congress Intended the Fair Sentencing Act to Have Retrospective Effect. . . . . . . . . .. 10

Congress Acknowledged that the 100:1 Ratio Inflicted Grievous,
Racially Disparate Harm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Congress Enacted the 100:1 Disparity Owing To Misinformation,
Causing a Generation to Suffer for No Reason . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Congress Noted That the 100:1 Ratio Actively Thwarted Law
Enforcement Goals and Undermined Respect for the Law . . . . . . . . . . . . . . . . . . . . 14

To Deny Retroactive Application of the Fair Sentencing Act
Would Frustrate Congress's Intent to Remedy a Gross Injustice . . . . . . . . . . . . . . . . . 16

The Saving Statute and the Fair Sentencing Act Should Be Read
to Avoid a Conflict with the Fifth Amendment's Equal Protection
Clause and the Eighth Amendment's Prohibition Against Cruel and
Unusual Punishment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Fifth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

Eighth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

# TABLE OF AUTHORITIES

*Apprendi v. New Jersey,* 530 U.S. 466 (2000)...............................................................5,7

*Atkins v. Virginia*, 536 U.S. 304 (2002)..........................................................................24

*Batson v. Kentucky*, 476 U.S. 79 (1986).........................................................................20

*Bradley v. United States*, 410 U.S. 605 (1973)...............................................................3

*Bridges v. United States*, 346 U.S. 209 (1953).............................................................5

*Clark v. Martinez*, 543 U.S. 371 (2005).........................................................................20

*Curtis v. United States*, 294 F.3d 841 (7th Cir. 2002) ..................................................7

*Ewing v. California*, 538 U.S. 11 (2003) .........................................................................24

*Graham v. Florida*, 130 S.Ct. 2011 (2010)..............................................................22, 24

*Great Northern Ry. Co. v. United States,* 208 U.S. 452 (1908)................................3, 9

*Griffith v. Kentucky*, 479 U.S. 314 (1987).................................................................20, 21

*Hamm v. City of Rock Hill,* 379 U.S. 306 (1965).......................................................3, 9

*Harris v. United States,* 536 U.S. 545 (2002).............................................................4, 5

*Hertz v. Woodman*, 218 U.S. 205 (1910) ......................................................................4

*Johnson v. United States,* 520 U.S. 461 (1997) .............................................................21

*Jones v. United States*, 526 U.S. 227 (1999).................................................................20

*Kennedy v. Louisiana,* 128 S. Ct. 2641 (2008)..............................................................24

*Kimbrough v. United States*, 552 U.S. 85 (2007).........................................................22

*Laurence v. Texas*, 539 U.S. 558 (2003) ........................................................................21

*Marrero v. Warden Lewisburg Penitentiary,* 417 U.S. 653 (1974) .......................3, 4, 5

*Ring v. Arizona*, 536 U.S. 584 (2002)...........................................................................6, 7

*Roper v. Simmons*, 543 U.S. 551 (2005).................................................................24, 25

*Schriro v. Summerlin*, 542 U.S. 348 (2004) ................................................................6

*Stogner v. California*, 539 U.S. 607 (2003)................................................................6

*Teague v. Lane*, 489 U.S. 299 (1989)........................................................................7

*United States v. Booker*, 543 U.S. 220 (2005)...........................................................8

*United States v. Mechem*, 509 F.2d 1193 (10th Cir. 1975).........................................6

*United States v. Obermeier*, 186 F.2d 243 (2d Cir 1950)........................................5, 6

*United States v. Blue Sea Line*, 553 F.2d 445 (5th Cir. 1977) .................................5, 6

*United States v. Gaudin*, 515 U.S. 506 (1995)........................................................21

*United States v. Chambers*, 291 U.S. 217 (1934)......................................................9

*United States v. Reisinger*, 128 U.S. 398 (1888)......................................................4

*United States v. Rutherford*, 442 U.S. 544 (1979) ....................................................9

*Weems v. United States*, 217 U.S. 349 (1910)........................................................22

## STATUTES

U.S. Const. Amend. V.............................................................................................21, 26

U.S. Const. Amend. VIII.....................................................................................22, 23, 26

1 U.S.C. § 109........................................................................................................2, 3

18 U.S.C.§3553(e) ..................................................................................................2, 7

18 U.S.C. § 3553(f) .................................................................................................2, 8

21 U.S.C. § 841.......................................................................................................1, 2

28 U.S.C § 2255........................................................................................................8

USSC, *Sourcebook of Federal Sentencing Statistics 2009*...........................................5

USSC, *Cocaine and Federal Sentencing Policy* (2007). .............................................23

*USSG App. C., Amend 706.* .....................................................................................23

USSC, *Cocaine and Federal Sentencing Policy* 8-9 (2007)..........................................................23

**OTHER**

*Albany Reaches Deal to Replay 70's Drug Laws*, NY Times,
March 26, 2009, ...........................................................................................................23

*Michigan to Drop Minimum Sentence Rules
for Drug Crimes*, NY Times, Dec. 26, 2002................................................................23

*Crack and Powder Cocaine Sentencing Policy in the Federal
Criminal Justice System*, 10 Fed. Sent. R. 192 (1998).................................................24

*Excessive Uniformity in Federal Drug Sentencing*, 25 J. Quant.
Criminology 155, 171 (2009) .......................................................................................22

*Mandatory Minimum Penalties in the Federal Criminal Justice System* (Aug. 1991). ...............25

*Public Opinion on Sentencing Federal Crimes* (Mar. 14, 1997) ..................................................24

*Restoring Fairness to Federal Sentencing: Addressing the
Crack-Powder Disparity: Hearing Before the Subcomm. on
Crime and Drugs of the S. Comm. on the Judiciary*, ...........................................11, 12, 15, 17, 19

*The Mostly Unintended Effects of Mandatory Penalties:
Two Centuries of Consistent Findings*, 38 Crime & Just. 65, 100 (2009) ...................................25

155 Cong. Rec. S10488, 10491-92 ....................................................................................13, 19

156 Cong. Rec. S1680, 1683 ...........................................................................................15

156 Cong. Rec. S1680, 1681 .......................................................................................12, 16

156 Cong Rec. H6196, 6203 ...........................................................................................14

156 Cong. Rec. H6196, 6198 ...........................................................................................15

156 Cong. Rec. H6196, 6202 .......................................................................................14, 17

156 Cong. Rec. H6196, 6199 .......................................................................................13, 15

156 Cong. Rec. H6196-01 ...........................................................................................21

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA

    - v. -

                                               10 Cr. 391 (CM)

ANTHONY BOYKIN, et al.,

                Defendants.

-------------------------------------------------------X


**THE FAIR SENTENCING ACT'S MODIFICATION OF
THE THRESHOLD QUANTITIES OF CRACK COCAINE,
RATHER THAN THE RACIALLY DISPARATE AND
HARSH PROVISIONS OF THE ANTI-DRUG ABUSE
ACT OF 1986 APPLY TO THIS CASE.**


        Defendant Joshua Arnold, joined by his most of his codefendants respectfully

submit the following memorandum of law in support of his motion for an order declaring that the

Fair Sentencing Act of 2010 ("the Fair Sentencing Act" or "the Act") is applicable to him and the

codefendants who have been sentenced.[1]

**Summary of Argument**

        The provisions of the Fair Sentencing Act of 2010 (the Act), which increased the amount

of crack cocaine necessary to trigger the five and ten-year mandatory minimum sentencing

provisions of 21 U.S.C. § 841, should apply to this case.

---

[1] Counsel would like to thank Alexander Eisenmann, Esq., James Schmitz, Esq., Mark
DeMarco, Esq., and the Office of Defender Services for permitting me to use and adapt their
submissions resulting in a savings of resources and time.

The general savings statute at 1 U.S.C. § 109 does not preclude application of the Fair Sentencing Act to defendants whose offenses occurred before August 3, 2010 (the date the Act took effect) because (1) the Act did not fundamentally change the penalty structure of the existing statute; (2) the Act primarily made a remedial or procedural change in the law rather than a substantive change; (3) the legislative history of the Act shows that Congress wanted to end immediately the discriminatory injustice wrought by the 1986 law's 100:1 crack–to-powder ratio; and (4) the saving statute and the Fair Sentencing Act should be read to avoid a conflict with the Fifth Amendment's Equal Protection Clause and the Eighth Amendment's prohibition against cruel and unusual punishment.

## Background

The Anti-Drug Abuse Act of 1986 (1986 law) limited a court's sentencing discretion by setting forth mandatory minimum terms of imprisonment for certain defendants that Congress deemed serious or major drug traffickers*, i.e.,* those whose offenses involved 5g or 50g of crack cocaine. *See* 21 U.S.C. § 841 (pre-August 3, 2010). If a defendant's offense involved 5g or more of crack cocaine, the court could not impose a sentence less than five years unless the defendant met the requirements of 18 U.S.C. § 3553(e) (cooperation) or §3553(f) (safety valve). If the defendant's offense involved 50g or more of crack cocaine, the court generally could not  impose a sentence less than ten years. The Fair Sentencing Act of 2010 loosened these restrictions on the court's sentencing discretion by increasing (from 5g to 28g and 50g to 280g) the quantity of crack cocaine that trigger the mandatory minimum terms. For those defendants whose offenses involve more than 50g of crack cocaine but less than 280g, the Act reduced the statutory maximum penalty from life to forty years.

Unlike other statutes, where Congress has expressly stated in the legislation that it intended for old law to apply to pending cases, Congress included no such provision in the Fair Sentencing Act. *See Marrero v. Warden Lewisburg Penitentiary 417 U.S. 653, 655-57 (1974)* (Congress included a saving statute in Comprehensive Drug Abuse Prevention and Control Act of 1970 when it, inter alia, abolished parole restrictions for certain narcotics offenders).

In the absence of any specific saving clause, this Court must decide whether the general saving statute preserves the old limits on the court's sentencing discretion or whether the Court may sentence the defendant under the provisions of the Fair Sentencing Act.

At common law, the repeal of a criminal statute, or its re-enactment with increased or decreased penalties, would have abated all prosecutions not yet final. *Bradley v. United States*, 410 U.S. 605, 607-08 (1973). To prevent such abatements that might arise from legislative inadvertence, Congress passed the federal saving statute, 1 U.S.C. § 109. *See Hamm v. City of Rock Hill*, 379 U.S. 306, 314-15 (1965).

Section 109 provides in relevant part:

The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

The federal saving statute supplies a general rule of statutory construction, which prescribes the effect of a repealing statute on an existing penalty in the absence of a contrary congressional intent. *Great Northern Ry. Co. v. United States.* 208 U.S. 452, 465 (1908) (general saving statute need not be enforced if by "necessary implication arising from the terms of the law as a whole, it results that the legislative mind will be set at naught by giving effect to the [saving

statute]." ); *Hertz v. Woodman*, 218 U.S. 205, 217 (1910) (provision is a "rule of construction . . . to be read and construed as part of all subsequent repealing statutes, in order to give effect to the will and intent of Congress"). Like all rules of general construction, it admits exceptions. An analysis of the general saving statute and its exceptions shows that it does not preserve the 1986 law's restrictions on the court's sentencing discretion.

### The Act Did Not Fundamentally Change the Penalty Structure of the Existing Statute

The Act's modification of the amount of cocaine necessary to trigger the mandatory minimum did not plainly "release or extinguish" a "penalty, forfeiture, or liability" in the 1986 law, as those terms are used in the general saving statute. The Court in *Marrero*, 417 U.S. at 660, held that the no parole provisions of the Narcotics Control Act of 1956 survived their repeal in the Comprehensive Drug Abuse Prevention and Control Act of 1970. The parole provisions of the 1970 Act decreased the amount of time a prisoner might serve by changing the sentence from a fixed term of years to an indeterminate one. The *Marrero* Court focused on the meaning of the words "penalty, forfeiture, or liability," equating them with common law "punishment, in connection with crimes of the highest grade." *Id*. at 661 (quoting *United States v. Reisinger*, 128 U.S. 398, 402 (1888)). Given the penal nature of the change in law, the saving statute applied and preserved the parole ineligibility provisions of the old law.

Here, the Fair Sentencing Act did not repeal any penalty contained in the statute. The Act merely modified the extent to which the amount of drugs involved in the offense limits the court's sentencing discretion. *Harris v. United States,* 536 U.S. 545, 567 (2002) (sentencing factor that triggers mandatory minimum merely limits the court's discretion in selecting penalty within statutory permissible range). The mandatory minimum terms of imprisonment of the 1986

law and the Fair Sentencing Act remain at five and ten years, as do the statutory maximum terms of forty years and life imprisonment. A defendant cannot get more punishment than before the Act and, with one exception, that has little practical effect,[2] there is no "*promise* that he will receive ""anything less."" *Harris*, 536 U.S. at 566 (quoting *Apprendi v. New Jersey,* 530 U.S. 466*, 498 (2000) (Scalia, J., concurring)). The saving statute, therefore, does not bar application of the Fair Sentencing Act to pending cases.

**The Act Primarily Made a Remedial or Procedural Change in the Law Rather than a Substantive Change**

Even if the Act"s increase in the quantity of crack cocaine triggering the mandatory minimums were a change in the "penalty, forfeiture, or liability," that conclusion would not end the inquiry because the general saving statute does not ordinarily apply to remedial or procedural changes. *Marrero*, 417 U.S. at 661*; Bridges v. United States*, 346 U.S. 209, 227 n. 25 (1953). The line between a right to enforce a liability or penalty, and a remedy or procedure, is not fixed, but depends on context. *United States v. Blue Sea Line*, 553 F.2d 445 (5th Cir. 1977) ("cases will arise in which it may fairly be said that a statutory change both alters a penalty and modifies a procedure.")

As an example of a remedy or procedure that would not be preserved by the general saving statute, the *Marrero* Court cited *United States v. Obermeier*, 186 F.2d 243, 253 (2d Cir.

---

[2]By increasing the quantities necessary to trigger the mandatory minimums, the Act lowered the statutory maximum for those defendants whose offense involved more than 50g of crack cocaine, but less than 280g. Those defendants are now subject to a statutory maximum penalty of forty years rather than life imprisonment. Because the vast majority of crack cocaine defendants are sentenced within or below the guideline range, the lowering of the statutory maximum for these defendants has little practical effect. *See* USSC, *Sourcebook of Federal Sentencing Statistics 2009*, Table 45 and Figure J (mean sentence for crack cocaine defendants was 114. 8 months; median sentence was 96 months).

1950). 417 U.S. at 661. *Obermeier* holds that the saving statute did not preserve the period of limitations for a prosecution after Congress had passed legislation reducing the statute of limitations from five to three years. According to *Obermeier,* a statute of limitations defined neither a substantive right nor liability within the meaning of the saving statute. Yet, no question exists that a statute of limitations governs the punishment that may be imposed upon an individual such that a legislature may not extend a statute of limitations for a criminal offense where the prosecution would otherwise be time-barred without violating the ex post facto clause. *Stogner v. California*, 539 U.S. 607, 613 (2003).

Other examples of remedies or procedures not preserved by the general savings statute but which altered the punishment that could be imposed, include an overhaul of juvenile justice procedure, *United States v. Mechem*, 509 F.2d 1193, 1196 (10th Cir. 1975), and changes in maritime law, which replaced criminal penalties with civil penalties. *Blue Sea Line*, 553 F.2d at 449. In both instances, new legislation either ameliorated or extinguished a penalty, but the courts nonetheless held the saving statute did not preserve the old penalties.

Here, the Act's change in the quantity of crack necessary to trigger a mandatory minimum worked a procedural change. In a related context, the Supreme Court has said "[a] rule is substantive rather than procedural if it alters the range of conduct or the class of person that the law punishes. In contrast, rules that regulate only *the manner of determining* the defendant's culpability are procedural." *Schriro v. Summerlin*, 542 U.S. 348, 353 (2004) (emphasis in original). So for example, the rule announced in *Ring v. Arizona*, 536 U.S. 584 (2002), which requires that an aggravating factor in a death penalty case must be proven to a jury beyond a reasonable doubt – was a procedural rule. *Summerlin*, 542 U.S. at 354 (rejecting Ninth Circuit's

view that *Ring* was a substantive rule because it modified the elements of the capital offense under Arizona law). It did not "alter the range of conduct Arizona law subjected to the death penalty. Instead, *Ring* altered the range of permissible methods for determining whether a defendant's conduct is punishable by death, requiring that a jury rather than a judge find the essential facts bearing on punishment. Rules that allocate decision-making authority in this fashion are prototypical procedural rules." *Id.* (citations omitted).

Retroactivity for cases already final should not be confused with the question presented here: whether the general saving statute preserves the mandatory minimum quantity thresholds set forth in the 1986 law. Different rules apply depending on the finality of the judgment and whether the source of the change in law is judicial or legislative: on collateral review, procedural changes set forth in case law are not retroactive, *Teague v. Lane*, 489 U.S. 299 (1989), for cases not yet final, procedural changes set forth in legislation apply retrospectively because the general saving statute does not preserve them.

In this case, the Fair Sentencing Act did not alter the range of conduct or the class of persons that the law punishes. Trafficking in crack cocaine is still a crime and no class of persons is excluded from punishment. *Cf*. *Curtis v. United States*, 294 F.3d 841, 843 (7th Cir. 2002) (rule in *Apprendi*, 530 U.S. 466, not retroactive because it addresses "quantum of evidence required for a sentence, rather than with what primary conduct is unlawful."). Instead, the Act altered the method for determining the permissible punishment by changing the weight that a judge must place on a particular fact (drug quantity). In essence, the Act recalibrates the decision-making authority for a sentence between the judge, Congress, and the government. Whereas the judge or jury finds the facts (drug quantity), Congress determines the relevance of

those facts in the sentencing decision by setting forth the mandatory minimum and providing for a safety-valve. *18 U.S.C. § 3553(f)*. If the defendant's offense involved more than 28g of crack or more than 280g of crack, then the court's sentencing options are more limited than if the offense involved lesser amounts of crack cocaine. Where the offense involves quantities more than 28g, then the government also shares decision-making authority in whether the sentence may go below the mandatory minimum. *18 U.S.C. § 3553(e)* (government motion for substantial assistance).

Cases addressing the retroactivity of *United States v. Booker*, 543 U.S. 220 (2005), in post-conviction proceedings under *28 U.S.C § 2255* are also instructive on whether the Fair Sentencing Act worked a predominantly procedural change in the law. *Booker* of course changed the Sentencing Reform Act from a mandatory sentencing system to an advisory one. It made no primary conduct lawful and declared no sentencing factor invalid. In essence, it shifted decision-making authority away from the Sentencing Commission and to the sentencing judge. Courts have universally held that it worked a procedural change, not a substantive one, and thus was not applicable to cases that became final before it was decided.[3]

The Fair Sentencing Act makes an even more modest change in the law than *Booker*. It gives judges greater discretionary authority when imposing sentences on certain crack cocaine

---

[3]*See .e.g., In re Fashina,* 486 F.3d 1300, 1304 (D.C. Cir. 2007); *Cirilo-Munoz v. United States,* 404 F.3d 527, 542 (1st Cir. 2005); *Guzman v. United States,* 404 F.3d 139, 142 (2d Cir. 2005); *Lloyd v. United States,* 407 F.3d 608, 611-12 (3d Cir. 2005); *United States v. Morris,* 429 F.3d 65, 69 (4th Cir. 2005); *United States v. Gentry,* 432 F.3d 600, 603 (5th Cir. 2005); *Duncan v. United States,* 552 F.3d 442, 447 (6th Cir. 2009); *McReynolds v. United States*, 397 F.3d 479, 481 (7th Cir. 2005); *Never Misses a Shot v. United States*, 413 F.3d 781, 783 (8th Cir. 2005); *United States v. Cruz,* 423 F.3d 1119, 1120 (9th Cir. 2005); *United States v. Bellamy*, 411 F.3d 1182, 1188 (10th Cir. 2005); *Varela v. United States*, 400 F.3d 864, 867 (11th Cir. 2005).

offenders by increasing the quantity of drugs triggering the mandatory minimum terms. It is no more a change in a substantive rule than *Booker*. In short, because the Act works as much, if not more, of a procedural change as a substantive change in the law, the general saving statute does not preserve the 1986 law's 5g and 50g triggering quantities for mandatory minimum sentences.

**The Legislative History of the Act Shows That Congress Wanted to End Immediately the Discriminatory Injustice Wrought by the 1986 Law's 100:1 Crack–to-powder Ratio**

The Supreme Court made clear long ago that the general savings statute need not be enforced where "either by express declaration or necessary implication, arising from the terms of the law as a whole, its results that the legislative mind will be set at naught by giving effect to the provisions of the [general saving statute]." *Great Northern Ry. Co*., 208 U.S. at 465. *See also United States v. Rutherford*, 442 U.S. 544, 552 (1979) (recognizing that exceptions to statutory language may be implied "where essential to prevent 'absurd results' or consequences obviously at variance with the policy of the enactment as a whole.")

The Court expressed a similar view in *Hamm v. City of Rock Hill,* 379 U.S. 306, 308 (1965), where it recognized a general "principle... of imputing to Congress an intention to avoid inflicting punishment at a time when it can no longer further any legislative purpose, and would be unnecessarily vindictive."  In two cases, the Supreme Court has declined to preserve prosecutions that were contrary to congressional legislation or the will of the people as expressed in a constitutional amendment. *Hamm*, 379 U.S. 306 (state trespass convictions for sit-in lunch counter demonstrations abated in light of passage of Civil Rights Act of 1964)); *United States v. Chambers*, 291 U.S. 217 (1934) (convictions for transporting liquor abated following passage of the Twenty-First Amendment, which abolished Prohibition era laws). As shown below, the Congressional record makes it very clear that Congress found the 100:1 ratio served no purpose

and was exceedingly cruel.  In *United States v. Rutherford*, 442 U.S. 544, 552, 99 S. Ct. 2470, 2475 (1979), the Supreme Court noted that it would read exceptions only into a "clearly delineated" statute to avoid "consequences obviously at variance with the policy of the enactment as a whole."

Here, the legislative history of the Fair Sentencing Act demonstrates that the intent of Congress would be frustrated by invoking the general saving statute to preserve the draconian, racially discriminatory provisions of the 1986 law.   Congress passed the Fair Sentencing Act, with virtually unanimous support, to remedy the racially discriminatory impact of the 1986 law and because the 100-to-1 ratio had no evidentiary basis.

**Congress Intended the Fair Sentencing Act to Have Retrospective Effect**

This memorandum does not confront the issue of whether the Fair Sentencing Act should be applied "retroactively," that is to defendants who have already been sentenced under the 100:1 ratio.  It is limited to examining whether it should be applied "retrospectively," a term we use to cover defendants who committed their offenses prior to the Act's effective date, but who have not yet been sentenced.

The number of  procedurally distinct subsets of those two categories of defendants who committed offenses prior to the Act's effective date, some or all of whom may also be entitled to retroactive or retrospective relief are:  (1) sentenced defendants whose convictions have been final for more than one year, (2) sentenced defendants whose convictions have been final for less than one year, (3) sentenced defendants whose convictions are not yet final, (4) not-yet-sentenced defendants who were convicted before the Act's effective date, (5) not-yet-sentenced defendants who were convicted after the Act's effective date, (6) pretrial defendants who were

indicted prior to the Act's effective date and (7) pretrial defendants who were indicted after the Act's effective date. There will also be a growing number of pretrial defendants whose offenses "straddled" the Act's effective date.

The congressional debates generally discussed "retroactive" relief without getting into these types of distinctions. As a matter of elementary logic and basic fairness, however, if Congress intended for the law to apply retroactively, to those already sentenced, it would seemingly have to apply retrospectively as well. However, Mr. Arnold and many others covered by this application fall within category six (6), while others may fall within categories four (4) and five (5). Thus, to decide his motion, the Court does not need to decide whether defendants in categories 1-3 would also be entitled to retroactive or retrospective relief.

As previously noted, Congress did not include a specific provision in the Fair Sentencing Act addressing retrospective application. Nevertheless, during the debates surrounding the bill's passage, Senators and Representatives made plain that the Act was designed with a remedial purpose and it would be utterly inconsistent with that purpose to apply it only to those individuals who committed offenses after its effective date.

**Congress Acknowledged that the 100:1 Ratio Inflicted Grievous, Racially Disparate Harm**

The Fair Sentencing Act is hardly "clearly delineated" on this point because it is completely silent. Yet to deny its retrospective application would do violence to Congress's unmistakable intent to correct twenty-four years of disastrous and inhumane drug policy.

The 100:1 disparity has sorely afflicted African-American communities. Taking all cocaine offenders (including crack offenders) as a whole, African-American drug defendants such as Mr. Arnold, have a 20% greater chance of being sentenced to prison than white

defendants, and on average crack sentences are three years longer than offenses involving powder. *Restoring Fairness to Federal Sentencing: Addressing the Crack-Powder Disparity: Hearing Before the Subcomm. on Crime and Drugs of the S. Comm. on the Judiciary*, 111th Cong. at 85, 87 (statement of Nicole Austin-Hillery, Dir., Brennan Center for Justice) [hereinafter *Restoring Fairness to Federal Sentencing Hearing*].[4] As a result of the mandatory minimum sentences for crack offenses, African-Americans serve almost as much time in prison for drug offenses as white defendants do for violent offenses. *Id.*

> The passage of the 100:1 sentencing ratio resulted in the incarceration of thousands of people because of this heavy sentencing disparity and a belief in the African-American community that it was fundamentally unfair. . . . African Americans make up about 30 percent of crack users in America, but they make up more than 80 percent of those who have been convicted of Federal crack offenses.

156 Cong. Rec. S1680-81 (daily ed., Mar. 17, 2010) (statement of Sen. Durbin).

Congress appears to have recognized that the 100:1 crack-sentencing regime had a seriously disparate effect on a suspect racial class, implicating the constitutional guarantee of equal protection. Senator Pat Leahy of Vermont denounced the 100:1 ratio in equal protection terms: "The racial imbalance that has resulted from the cocaine sentencing disparity disparages the Constitution's promise of equal treatment for all Americans." *Id.* at 1682. In enacting the new law, the Senate was mindful that the crack-powder disparity was "one of the most notorious symbols of racial discrimination in the modern criminal justice system." *Restoring Fairness to Federal Sentencing Hearing* at 166 (statement John Payton, President, NAACP Legal Defense & Educational Fund).

---

[4] Available at http://frwebgate.access.gpo.gov/ cgi-bin/getdoc.cgi?dbname=111_senate_hearings&docid=f:57626.pdf

As noted above, in evaluating the unanticipated effects of the 100:1 sentencing ratio, Congress made no distinction between those already sentenced, those now facing charges under the old regime, and those yet to be charged. The United States Constitution affords protection to victims of racial discrimination equally. As the unassailable comments during hearings about unfairness establish, Congress certainly regarded those sentenced under the 1986 law to have been victims of a serious legislative injustice.

**Congress Enacted the 100:1 Disparity Owing To Misinformation, Causing a Generation to Suffer for No Reason**

The disparate and shockingly unequal application of the 100:1 ratio is all the more unnerving because the lawmakers' concerns were, in hindsight, entirely unfounded, as they themselves now recognize. Congress's assumptions about crack in the mid-1980's has since been completely refuted by later research, as was reflected in statements made in support of the Act. For example, as one Member noted during the House debate:

> Although Congress in the mid-1980s was understandably concerned that the low-cost and potency of crack cocaine would fuel an epidemic of use by minors, the epidemic of crack cocaine use by young people never materialized to the extent feared. In fact, in 2005, the rate of powder cocaine use among young adults was almost 7 times as high as the rate of crack cocaine use. Furthermore, sentencing data suggest that young people do not play a major role in crack cocaine trafficking at the Federal level.

156 Cong. Rec. H6196, 6199 (daily ed. Jul. 28, 2010) (statement of Rep. Lee). Senator Durbin was even more forceful when sponsored the Senate legislation in 2009:

> We now know the assumptions that led us to create this disparity were wrong. . . . We were told [crack] is different; it is more addictive. It is not. We were also told it was going to create conduct which was much more violent than those who were selling powder cocaine and their activities. It did not.

155 Cong. Rec. S10488, 1491 (daily ed. Oct. 15, 2009) (statement of Sen. Durbin).

Regardless of the intentions of lawmakers in 1986, Congress today recognizes that the 100:1 sentencing ratio was a hugely disproportionate response bordering on hysteria and intended the Act to rectify its earlier action. "We are not blaming anybody for what happened in 1986, but we have had years of experience and have determined that there is no justification for the 100-to-1 ratio. . . [W]e are <u>fixing</u> what we have learned through years of experience." 156 Cong. Rec. H6196, 6202 (daily ed. Jul. 28, 2010) (statement of Rep. Scott) (emphasis added).

Whatever the legitimate state purpose in controlling the spread of a dangerous drug, Congress has now acknowledged that punishing crack offenders at levels one hundred times more serious than powder cocaine offenders was not based on fact and bears no rational relationship to the actual circumstances in the fight against drugs.

**Congress Noted That the 100:1 Ratio Actively Thwarted Law Enforcement Goals and Undermined Respect for the Law**

Written in response to sensationalized news stories about crack in the mid-1980's, the 100:1 disparity has not simply amplified racial inequality; it has also undermined law enforcement, suggesting that the longstanding disparity was not rationally related to any legitimate government purpose. Congress heard the ratio denounced as "counterproductive and unjust" by the Judicial Conference of the United States, the National District Attorney's Association, the National Association of Police Organizations, the Federal Law Enforcement Officers Association, the International Union of Police Associations, and dozens of former Federal judges and prosecutors. 156 Cong Rec. H6196, 6203 (daily ed. Jul. 28, 2010) (statement of Rep. Hoyer reflecting consensus of law enforcement organizations).

Congress recognized that several of these law enforcement organizations opposed the 100:1 sentencing ratio because it consumes so many resources prosecuting minor offenders.

15

The primary goal underlying the crack sentence structure was to punish the major traffickers and drug kingpins who were bringing crack into our neighborhoods. . . . [J]ust the opposite has happened. The Sentencing Commission has reported for many years that more than half of Federal crack cocaine offenders are low-level street dealers and users, not the major traffickers Congress intended to target.

156 Cong. Rec. S1680, 1683 (daily ed. Mar. 17, 2010) (statement of Sen. Leahy). "Data collected by the U.S. Sentencing Commission show that Federal resources have been targeted at offenders who are subject to the mandatory minimum sentences, which sweep in low-level crack cocaine users and dealers." 156 Cong. Rec. H6196, 6199 (daily ed. July 28, 2010) (statement of Rep. Lee). In other words, the 100:1 ratio <u>frustrated</u> Congress's original goal of deterring crime, by draining law enforcement resources away from attacking high level dealers.

Congress further recognized that the 100:1 crack-powder ratio did not simply hinder effective law enforcement, but actually increased crime levels.

[I]t is important that this 1-to-18 [ratio] be put in place in response to the 1980s when we thought this devastating act of using drugs was the underpinnings of crime, but what we have seen and what the U.S. Sentencing Commission has seen is that we're creating crime by throwing these individuals in jail instead of rehabilitation and by keeping this oppressive sentencing structure.

156 Cong. Rec. H6196, 6198 (daily ed. Jul. 28, 2010) (statement of Rep. Lee).

Even worse, the 100:1 ratio corroded citizens' faith in the judicial process. The Honorable Reggie Walton, United States District Judge for the District of Columbia, testified to the Senate Subcommittee on Crime and Drugs that he observed this cynicism in his jury pool, as many refused to serve in drug cases by citing the injustice of the crack-powder disparity. *Restoring Fairness to Federal Sentencing Hearing* at 8. Even when the jurors did serve, they frequently disagreed so passionately with the existing law's racially disparate cruelty that they refused to convict even in the face of overwhelming evidence. *Id.* As Judge Walton explained, "it is very

unfortunate in America that we have a sizable portion of our population who feel that the system is unfair and feel that race underlies what is being done in reference to how we prosecute and how we sentence certain offenders." *Id*. The 100:1 ratio was so broken that jurors disregarded plain evidence in violation of their civil obligations, because they did not trust the federal courts to deliver justice under the law.

In short, the 100:1 ratio worked a shameful injustice on defendants and proved itself an unmitigated disaster for law enforcement and the federal courts and this continues to be true for those with pending cases and even those who have not yet been charged. In promulgating the Fair Sentencing Act, Congress appears to regard the last twenty-four years of sentencing with revulsion and profound regret, and it is reasonable to conclude that it, therefore, intended to afford relief to those afflicted by its mistake.

**To Deny Retroactive Application of the Fair Sentencing Act Would Frustrate Congress's Intent to Remedy a Gross Injustice**

In reviewing the legacy of the 100:1 ratio, lawmakers made clear that the Fair Sentencing Act was intended to correct a massive and long-standing injustice and to stop it in its tracks before any other individuals are subject to its inhumane impact. Senator Durbin, addressing the Senate, called for urgent action: "We have talked about the need to address the crack-powder disparity for too long. Every day that passes without taking action to solve this problem is another day that people are being sentenced under a law that virtually everyone agrees is unjust." 156 Cong. Rec. S1680, 1681 (daily ed. Mar. 17, 2010).

As can be seen in remarks during the floor debates, Congress found the 100:1 disparity a grave and unconscionable threat to equal protection. It would strain the imagination to hold that in so finding, Congress intended to ensure equal protection and fundamental fairness only to

future defendants while denying any relief to those, like Mr. Arnold, still facing charges based on the unjust sentencing regime.

Representative Keith Ellison of Minnesota, a former public defender, offered personal reflections on the fundamental injustice of the 100:1 ratio:

> I think what disgusted me the most is the human potential that would just be thrown away, as I would have to tell a young person who was caught with crack that if they'd had cocaine they would have a chance at probation, they would be able to really take advantages of treatment and perhaps reconstruct their lives. But because they had crack, their lives were going to be basically over at a pretty young age, thrown away in a cell to have really no real opportunity, be in prison for 10, 5 years for what another person would get probation for. And this made it incredibly difficult to argue that our system of law was fair.

156 Cong. Rec. H6196, 6202 (daily ed. July 28, 2010). This argument is not simply prospective, but retrospective as well, since those currently facing charges under the 100:1 ratio are also potential victims of Congress's misguided lawmaking almost twenty-five years ago. This year, Congress was moved to take action in response to a generation of African-American defendants' unjust suffering; Congress cannot have intended for that suffering to remain ongoing, like some living monument to heedless actions in 1986.

Testimony before the Senate Subcommittee on Crime and Drugs on April 29, 2009, lends further evidence that Congress intended the Fair Sentencing Act to have retroactive (and thus presumably retrospective) application. During hearings, several senators appeared to endorse the view that the Fair Sentencing Act should apply retroactively. Senator Feinstein noted her position is that "any change has to have retroactive consideration," and Senator Durbin agreed. *Restoring Fairness to Federal Sentencing Hearing* at 19. Asa Hutchinson, a former federal prosecutor and Member of the House, testified, "whatever changes you make, I do believe have to be applied retroactively" because, "[a]s Judge Reggie Walton, who previously testified, has said, 'I do not see

how it is fair that someone sentenced on October 30th gets a certain sentence when someone sentenced on November 1 gets another sentence.'" *Id.* at 27.[5]

The subcommittee members and witnesses seemed to agree that, in broad terms, applying the new law to those who had already been sentenced was a highly desirable goal; presumably, the far more modest goal of applying the new regime to those defendants who, like Mr. Arnold, were charged under the 100:1 ratio but have not yet been convicted or sentenced would have enjoyed even greater support.

While some members of the Subcommittee wondered that applying the new law retroactively (and, by implication, retrospectively) might overwhelm the federal court system with litigation, *Id.* at 12 (statement of Sen. Durbin), the Honorable Ricardo H. Hinjosa, Acting Chair of the United States Sentencing Commission, assured the senators that the courts had proven able to deal with the retroactive 2007 Sentencing Guidelines adjustment to crack offenses without any great difficulty, though he admitted he did not know exactly how many would be eligible to have their sentences reviewed if the new law were retroactive. *Id.* at 12-13, 17. Judge Walton responded,

> Has [the 2007 crack guidelines amendment] placed a burden on the courts? Yes, it has. But I do not think we can let that burden impair us from doing what fundamentally has to be done to make our process fair. So if it means my probation department and as individual judges we have to work a little harder in order to address the problem, we are prepared to roll up our sleeves and do it.

*Id.* at 12.

---

[5]     Mr. Hutchinson was quoting Judge Walton's testimony before the United States Sentencing Commission in 2007 with regard to applying the 2007 crack guidelines adjustments retroactively. *See*, United States Sentencing Commission, Public Hearing on Retroactivity at 16 (2007) (available at http://www.ussc.gov/hearings/11_13_07/Transcript111307.pdf).

There were some concerns raised during the Senate hearing about how retroactive application might affect the sentences of defendants whose high crack sentences had led prosecutors to drop other charges, such as otherwise applicable weapons offenses. *See, Restoring Fairness to Federal Sentencing Hearing* at 20 (remarks of Senator Klobuchar). Applying the new law retroactively might lead to inappropriately low sentences for some of those defendants. *See Ibid.* That type of concern would not apply to defendants like Mr. Arnold, however, who have not yet been sentenced because courts would be free to fashion non-guideline sentences with such factors in mind. Moreover, proposed changes in the crack guidelines would appear to address those types of concerns as well. *See* Proposed Emergency Amendment to the Sentencing Guidelines, September 2, 2010, at 5-7.

When introducing the legislation in October 2009, Senator Durbin recalled testimony before the subcommittee and his passionate speech about the human costs of the 100:1 disparity. It lends further support to the notion that the Act must be applied retroactively and, therefore, retrospectively:

> At the hearing I held in the Judiciary Committee, we heard testimony from Cedric Parker, who is from Alton in my home State of Illinois. In 2000, Mr. Parker's sister, Eugenia Jennings, was sentenced to 22 years in prison for selling 14 grams of crack cocaine. Mr. Parker told us that Eugenia was physically and sexually abused from a young age. She was addicted to crack by the time she was 15.
>
> Eugenia has three children, Radley, Radeisha, and Cardez. They are now 11, 14, and 15. These children were 2, 5, and 6 when their mother went to prison for selling the equivalent of 6 sugar cubes of crack. They have seen their mother once in the last 9 years. They will be 21, 24, and 25 when she is released in 2019.
>
> At Eugenia's sentencing, Judge Patrick Murphy said this: Mrs. Jennings, nobody has ever been there for you when you needed it. When you were a child and you were being abused, the Government wasn't there. But when you had a little bit of crack, the government was there. And it is an awful thing, an awful thing to separate a mother from her children. That's what the Government has done for

Eugenia Jennings.  It is time to right this wrong.  We have talked about the need to address the crack-powder disparity for long enough. Now, it's time to act.

155 Cong. Rec. S10488, 10491-92 (daily ed. Oct. 15, 2009) (emphasis added); *see also, Restoring Fairness to Federal Sentencing Hearing* at 28-31 (statement of Cedric Parker).  It is difficult to imagine that after citing the human wreckage left in the passage of the 100:1 disparity, Senator Durbin, the bill's co-sponsor and its most vocal champion, intended to offer Ms. Jennings no relief.

**The Saving Statute and the Fair Sentencing Act Should Be Read to Avoid a Conflict with the Fifth Amendment's Equal Protection Clause and the Eighth Amendment's Prohibition Against Cruel and Unusual Punishment**.

This Court should construe the general savings statute and the Fair Sentencing Act to avoid serious constitutional questions, implicating both the Fifth Amendment guarantee of Equal Protection and the Eighth Amendment guarantee against cruel and unusual punishment. When a statute is susceptible to two constructions, one of which raises grave and doubtful constitutional questions, and the other, which avoids such questions, the court's duty is to adopt the latter. *Jones v. United States*, 526 U.S. 227, 239 (1999). The avoidance canon "is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts." *Clark v. Martinez*, 543 U.S. 371, 381 (2005). It "is a means of giving effect to congressional intent, not of subverting it." *Id*. at 382.

**Fifth Amendment**

The general saving statute must be narrowly construed to avoid conflicting with the Equal Protection Clause of the Fifth Amendment. When the Supreme Court announces new rules of substantive or procedural law, those rules apply to cases not yet final. *Griffith v. Kentucky*, 479

U.S. 314 (1987). In *Griffith*, the Supreme Court held that its earlier decision in *Batson v. Kentucky*, 476 U.S. 79 (1986), applied to eight cases on direct review when the Court decided *Batson*. While relying in part on its own "norms of constitutional adjudication," the Court also recognized that the "selective application of new rules violates the principle of treating similarly situated defendants the same," 479 U.S. at 323, a principle that arises out of the guarantee of Equal Protection. *See Laurence v. Texas*, 539 U.S. 558, 579 (2003) (O'Connor, J., concurring). *Griffith's* rule applies to cases interpreting congressional statutes. *See Johnson v. United States,* 520 U.S. 461, 467 (1997) (defendant on direct appeal obtained benefit of *United States v. Gaudin*, 515 U.S. 506 (1995), which holds that materiality is an element of perjury that must be submitted to jury.)

The same Equal Protection principle behind the Supreme Court's decision in *Griffith* should apply here. Just as an ameliorative change in the judicial interpretation of a criminal statute must apply to cases on direct review, e.g. *Gaudin*, it must apply here to an ameliorative change to the drug quantities that trigger a mandatory minimum. As discussed earlier, Congress enacted the Fair Sentencing Act to correct the racially disparate impact of the 100-to-1 crack-cocaine powder ratio. Indeed, members of Congress expressly noted that the old ratio was "contrary to our fundamental principles of equal protection under the law." *See, e.g.* 156 Cong. Rec. H6196-01 (daily ed. July 28, 2010) (Statement of Rep. Clyburn).

**Eighth Amendment**

Application of the Fair Sentencing Act to cases not yet final will also avoid a conflict with the

Eighth Amendment.[6]  The constitutional protection against cruel and unusual punishment requires that a sentence serve at least one of the purposes of sentencing: retribution, deterrence, incapacitation, and rehabilitation. In serving those purposes, the punishment should be "graduated and proportioned" to the offense. *Weems v. United States*, 217 U.S. 349, 367 (1910).

The Supreme Court has delineated two separate lines of inquiry under the Eighth Amendment. One focuses on the particular sentence imposed on the defendant and asks whether it is grossly disproportionate. The other uses "categorical rules to define Eighth Amendment standards." *Graham v. Florida*, 130 S.Ct. 2011, 2022 (2010). Where a defendant challenges a "sentencing practice itself" and implicates a particular type of sentence as it applies to an entire class of offenders," a categorical analysis applies. *Id.* (holding that imposition of life without parole on a non-homicide juvenile offender is cruel and usual.)

Here, the categorical analysis applies because Mr. Arnold and his codefendants challenge the application of mandatory minimum sentences to those offenders who possess 5g or more but less than 280g of crack cocaine. These mandatory minimum terms may range from five years to life (for those defendants whose offense involved more than 50g of crack cocaine and who had two or more prior convictions for a felony drug offense. 21 U.S.C. § 841(b).

"The analysis begins with objective indicia of national consensus." *Graham*, 130 S. Ct. at 2023. A growing consensus in our society recognizes that the exceedingly harsh sentences for nonviolent crack cocaine offenders set forth in the 1986 law exceed that which is necessary to accomplish the goals of sentencing, and create arbitrary disparities. *Kimbrough v. United States*,

---

[6]The Eighth Amendment states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

552 U.S. 85, 95-100 (2007) (criticizing crack-powder disparity); Eric L. Sevigny, *Excessive Uniformity in Federal Drug Sentencing*, 25 J. Quant. Criminology 155, 171 (2009) (describing results of empirical study showing that drug quantity "is not significantly correlated with role in the offense," and that this "lack of association" provides "fairly robust support of the claim of unwarranted or excessive uniformity in federal drug sentencing.")

The U.S. Sentencing Commission repeatedly recommended that Congress repeal the 100-to-1 crack-powder ratio in favor of a 1-to-1 ratio. *See, e.g.,* USSC, *Cocaine and Federal Sentencing Policy* (2007).  Recognizing the urgency of the problem, the Commission lowered the guidelines for crack offenses, stating that the 100-to-1 ratio "undermines various congressional objectives set forth in the Sentencing Reform Act and elsewhere." *USSG App. C., Amend 706.* Other states have abolished disproportionally high prison sentences for drug offenders. *See, e.g.*, Jeremy W. Peters, *Albany Reaches Deal to Replay 70's Drug Laws*, NY Times, March 26, 2009, at A.1; Associated Press, *Michigan to Drop Minimum Sentence Rules for Drug Crimes*, NY Times, Dec. 26, 2002, at A26.

In addition to community consensus, a court conducting an Eighth Amendment categorical analysis must look to the "culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question." *Id*. at 2026. Here offenders who committed their offenses before August 3, 2010 are not more culpable than those who committed their offenses after August 3, 2010. Indeed, the legislative history of the Fair Sentencing Act and events leading up to its passage shows that the 1986 law overstated the culpability of this category of crack offenders. *See, e.g.,* USSC*, Cocaine and Federal Sentencing Policy* 8-9 (2007) (1986 "quantity-based penalties sweep too broadly and apply most often to

lower level offenders;" 1986 "quantity-based penalties overstate the seriousness of most crack cocaine offenses and fail to provide adequate proportionality.").[7] Two administrations supported changes in the 100-to-1 ratio. *See* Janet Reno & Barry McCaffrey, *Letter to President Clinton: Crack and Powder Cocaine Sentencing Policy in the Federal Criminal Justice System*, 10 Fed. Sent. R. 192 (1998); Statement of Lanny Breuer, *supra.*

Nor can continued application of the harsh and discriminatory 1986 law be justified as a matter of retribution, deterrence, incapacitation, or rehabilitation. *See Graham*, 130 S.Ct. at 2028; *Ewing v. California*, 538 U.S. 11, 25 (2003); *Kennedy v. Louisiana,* 128 S. Ct. 2641, 2649-50 (2008); *Roper v. Simmons*, 543 U.S. 551, 571 -72 (2005). **"**With respect to retribution – the interest in seeing that the offender gets his "just deserts" – the severity of the appropriate punishment necessarily depends on the culpability of the offenders." *Atkins v. Virginia*, 536 U.S. 304, 319 (2002).

Congress has determined that the mandatory minimum sentencing provisions of the 1986 law were too severe and did not reflect the relative culpability of drug offenders. Congress's judgment about the culpability of drug offenses provides powerful evidence that society views offenders like the defendant as less deserving of mandatory minimum sentence than other offenders. The public also believes that mandatory minimum sentences are too harsh. *See* Peter H. Rossi & Richard A. Berk, *Public Opinion on Sentencing Federal Crimes* (Mar. 14, 1997) (public opinion survey conducted for the US Sentencing Commission in 1997 found that the guidelines,

---

[7]For over a decade, the Commission had urged Congress to reform the 1986 law. *See* USSC, *Special Report to Congress: Cocaine and Federal Sentencing Policy* (Feb. 1995); USSC, *Special Report to Congress: Cocaine and Federal Sentencing Policy* (Apr. 1997); USSC, *Special Report to Congress: Cocaine and Federal Sentencing Policy* (May 2002*).*

which are linked to the mandatory minimum drug quantities, produced "much harsher" sentences in drug trafficking cases than survey respondents would have given.)  To sentence an individual to a lengthier period of incarceration based upon the mere fortuity of when he or she committed the offense would be mindless vengeance, imposed without regard to individual moral accountability.

Application of the 1986 law also "makes no 'measurable contribution' to the goal of deterrence*" Roper*, 543 U.S at 593. Given that a person who currently commits a cocaine trafficking offense will not be subject to the 1986 law, it is fanciful to think that a now defunct law will deter anyone. Additionally, the 1986 law never proved to have any deterrent effect. USSC, *Cocaine and Federal Sentencing Policy* B-15 (Statement of Dr. Bruce Johnson) ("nearly impossible to document any deterrent effect of the 100-to-1 drug quantity ratio because crack cocaine distributors rarely mention awareness of it or report changing business activities due to its existence"); *see also* Michael Tonry, *The Mostly Unintended Effects of Mandatory Penalties: Two Centuries of Consistent Findings*, 38 Crime & Just. 65, 100 (2009) ("insufficient credible evidence to conclude that mandatory penalties have significant deterrent effects.")

Nor is application of the 1986 law necessary to incapacitate a crack cocaine offender. As a class, crack cocaine offenders are not violent offenders who need to be locked away from the public in order to protect public safety. For that small category of offenders who do need to be incapacitated, the Fair Sentencing Act contains penalty provisions sufficient to serve that purpose.

As to rehabilitation, mandatory terms of imprisonment do not even purport to advance that purpose, and in reality, they impede it. *Mandatory Minimum Penalties in the Federal Criminal Justice System* (Aug. 1991).

Given these grave concerns about the Fifth and Eighth Amendment implications of applying the 1986 law to defendants whose offense occurred before August 3, 2010 and whose convictions are not yet final, this Court should decline to apply the general saving statute to preserve the drug quantities specified in the 1986 law.

## CONCLUSION

For the above reasons Mr. Arnold on behalf of him and his codefendants respectfully submits Congress intended the Act to apply retrospectively and he respectfully requests that the Court declare that it applies to his offense.


Dated:  New York, New York
      November 2, 2010


 

_____
SAM A. SCHMIDT
Attorney for the Defendant
Joshua Arnold
111 Broadway, Suite 1305
New York, N.Y. 10006
(212) 346-4666